JAMES H. CLARK and WILLIAM T. CLARK, by W. S. Briggs, their guardian, vs. JOHN UNDERWOOD, impleaded with A. C. Montgomery and John Gardner.

M., the general guardian of infants who were owners of an estate in fee, in lands, in remainder, subject to the life estate of their mother, M. A. C. therein, acting in concert with and by the aid and procurement of G., (who had purchased M. A. C.'s life estate,) and U., applied to the court and obtained an order authorizing the sale of the interest of the infants in the land, and appointing M. special guardian of the infants, for the purpose of the sale. At the time of making this application, M. A. C., the tenant for life, was very sick and not expected to live; which fact was well known to M. G. and U., but was designedly concealed from the court. The order being obtained, M., as such special guardian, sold the property to U. for the sum of $8,673.82, including the life estate of M. A. C. therein, which was estimated at $6,601.44; leaving only $2,028.38 to be paid or secured to the infants for their share of the purchase money, after deducting $50 for the costs of the proceedings. And U. was directed by the order to pay said sum of $6,601.44 to G. as the owner of the life estate of M. A. C. The next day after the order confirming the sale was granted, M. A. C. died. *Held,* that the order appointing M. special guardian of the infants was fraudulently obtained, and the same, and all subsequent orders and proceedings founded and had thereon, for the purpose of obtaining the title of the infants to such real estate, were annulled, vacated and set aside, and the said proceedings were adjudged and declared to be fraudulent and void.

Fraud not only vitiates all sales and conveyances into which it enters, but the power and authority to sell and convey also, from whatever source derived.

An order giving a party authority to sell and convey, fraudulently obtained from a court, is no better than a power fraudulently derived from the party whose rights are injuriously affected by it. It may always be annulled at his instance, upon establishing the fraud, at least as to all persons who were parties or privies to such fraud.

THIS was an appeal by the defendant Underwood from a decree made by Justice Johnson at a special term of the court. The complaint alleged that Mary Ann Clark, the mother of the plaintiffs, on the 2d of March, 1850, was seised of the premises described in the complaint, for her own life, with remainder in fee to the plaintiffs and their infant sister. That on that day A. C. Montgomery, one of the defendants, was duly appointed the general guardian of the plaintiffs, by the surrogate of the

Clark *v.* Underwood.

county of Yates, and that he immediately took possession and control of their property and effects. That on the 8th of Nov. 1851, the said Montgomery, as such general guardian, and John Gardner and John Underwood, combining and confederating to cheat and defraud the plaintiffs, &c., Montgomery as such general guardian, by and with the aid, consent and procurement of the said Gardner and Underwood, presented a petition to the Hon. Andrew Oliver, judge of the Yates county court, for a sale of the interest of the plaintiffs and their infant sister in the said premises; among other things, representing that the said real estate was worth about the sum of $7000, and that the estate for the life of the said Mary Ann Clark, then claimed to be owned by the said John Gardner, was worth over four thousand dollars; and among other things, praying that the said A. C. Montgomery might be appointed special guardian of the plaintiffs and their infant sister, for the purpose of said sale. And the plaintiffs alleged that, at the time of presenting such petition to the said judge, the defendants well knew, and had been and were informed, that the said Mary Ann Clark was sick, and was not expected to live two days, and that Ezekiel Clark, of the town of Jerusalem, in the county of Yates, had been appointed by the surrogate of Yates county, and was, the general guardian for the infant sister of the plaintiffs, and was opposed to the said proceedings; that after the said petition had been presented to the said Oliver, the said Ezekiel Clark appeared before the said judge and informed him that Mary Ann Clark, the mother of the infants, was dangerously sick, and could not survive but a very few days, and offered to make the necessary proof thereof; that the said judge being satisfied that the representations of Clark were true, declined to act upon the said petition; that the said Montgomery, Gardner and Underwood, were informed that the said judge hesitated about acting upon the petition, or declined to entertain the same or grant any order thereon at that time, whereupon, Montgomery informed the said Ezekiel Clark and others that he should not take any proceedings, at that time, for the purpose of said sale, and left the village of Penn Yan; that the said petition remained before the

said judge until the 11th day of November, when the same was withdrawn by Gardner, by the direction of Montgomery, the said Gardner remarking, at the time of withdrawal of the said petition, that they had abandoned the idea of selling the interest of these plaintiffs in the premises, for the present; that after the withdrawal of the said petition, Montgomery, acting in concert with the other defendants, made another petition bearing date the 12th day of November, 1851, and caused and procured the same to be presented on that day, at a circuit court and special term of the supreme court, held at the court house in the town of Bath, in and for the county of Stueben, in and by which petition, Montgomery, among other things, represented that the plaintiff James H. Clark was about the age of twelve years, and the plaintiff William T. Clark was about the age of ten years, and that the plaintiffs were two of the children of George S. Clark and Mary Ann his wife, and as such were each entitled to one undivided third part, subject to the life estate of the said Mary Ann and the said George S. Clark, as tenant by the curtesy, in the two pieces of land therein particularly mentioned and described; that the said lands were worth about the sum of seven thousand dollars, including the life estate of the said Mary Ann Clark, and that the infant daughter of the said George S. Clark and Mary Ann, who was under the age of twenty-one years, was seised of the one equal undivided third part of the said lands, subject to the life estate of the said George S. and Mary Ann Clark, and that the estate in remainder in fee in the said premises was held in common and undivided by the said infants, the plaintiffs, and the said infant daughter, Mary Alice Clark; and that the said Mary Ann Clark had sold and conveyed her life estate in the said lands above described, by deed, to John Gardner, in which deed of conveyance the said George S. Clark had joined, to convey his life estate, and that the said John Gardner was in no way related to the said infants, and would feel an interest in any improvement of the said lands, in repairing the buildings or fences thereon, beyond his interest in the said life estate of the said Mary Ann; that the said Mary Ann was of about the age of

thirty-four years; that upon the said premises there were three dwelling houses, two large barns, and many other out buildings, which were very old and fast falling to decay; that there had been no repairs made upon the same, or any thing done to prevent the decay and dilapidation of the same, and if all the said buildings were in a good state of repair, the value would amount to as much as one-third of the value of said premises; and that the plaintiffs were each indebted to the said George S. Clark for necessary clothing, schooling, care and attention and support, and that it was necessary that the above premises should be sold, and the proceeds applied towards defraying the necessary education and support and maintenance of said infants; and that if the interest of the said infants in the premises should be sold, and the moneys arising therefrom securely invested, and the annual interest thereof paid to their use and benefit, it would be sufficient to defray the said expenses, and to pay the said indebtedness, and at their tender age would be more advantageous to their interest than to hold the same in land; and that John Gardner, who owned and held the life interest and estate of the said Mary Ann Clark and the said George S. Clark, in the premises, was willing and desirous to join in said sale of the premises on the principle of life annuities; and that the premises would fetch a much larger price when so conveyed, as the purchaser could at once receive the possession thereof, as well as the remainder in fee. That the said Montgomery, in and by his said petition, among other things, prayed that the said premises might be sold by an order of the court and under its direction, and that he, the petitioner, might be appointed special guardian, for the purpose of selling the interest of the said infants in the said real estate. That upon presenting said petition to the court, an order was made appointing Montgomery special guardian of the plaintiffs, and directing that it be referred to Ansel I. McCall, to ascertain the truth of the facts stated in said petition, and to report thereon, agreeably to the sixty-fifth rule of the court. And the said referee was required to ascertain the value of the life estate of the said Mary Ann Clark, as then owned by the said John Gardner, in the

premises, or any person entitled to the same, or who was willing to join in the sale. The referee subsequently reported that the whole of said premises were worth, in· the aggregate, seven thousand three hundred dollars, and that, in his opinion, it would be for the interest of the infants to have the same sold upon the following conditions; that so much of the proceeds of their share or interest in the same as might be necessary to pay their respective proportions of the gross value of the life estate of the said Mary Ann Clark therein, and the costs of the pro- ceedings, be paid by the purchaser on the delivery of the deed, and that the payment of the residue of the purchase money of the interest of the said infants be secured by the bond of the pur- chaser and a mortgage upon the premises, to the infants, con- ditioned to pay the interest thereon annually, at the rate of seven per cent on the principal portion of each, as they should severally arrive at the age of twenty-one years; that the said infants were not in absolute want of any of the proceeds of the sale for their support and maintenance over and above the an- nual interest thereof; and that John Gardner, the person own- ing the life estate of the said Mary Ann Clark in the premises, was willing to join in the said sale, and that the referee had ascertained the value of her said life estate in the premises on the principle of life annuities, and that the present value of the same was $4,962.97.

·The plaintiffs further alleged that this report was subse- quently confirmed by the court, and it was further ordered, that Montgomery, as special guardian of the said infants, be and· he was thereby authorized and empowered to contract for the sale and conveyance of all the right, title and interest of the said infants in and to such real estate, at a price not less than the sum specified by the referee in his report as the value thereof, and upon the terms and conditions therein specified, stating that he had entered into an agreement, subject to the approbation of the court, with John Underwood, for the sale of all the right, title and interest of the infants in and to said real estate, upon the following terms and conditions: Underwood was to pay there- for the sum of $8,673.82, including the life estate of Mary Ann

Clark *v.* Underwood.

Clark and the interest of the two said infants, it being at the rate of the sum of $40 per acre for the said premises, which sum was payable as follows: So much of the purchase money as should be necessary to pay the respective portions of all the said infants of the gross amount supposed to be the value of the life estate of the said Mary Ann Clark, in hand to the said John Gardner, the owner thereof, and so much as was required to pay the said infants' portion of the costs of the proceedings, on the delivery of the deed, and the payment of the residue of said purchase money to be secured by the bond of the purchaser and a mortgage upon the premises, to be given by him to the said infants, conditioned to pay the interest thereon annually, and the principal in two equal installments, payable when the said infants should respectively arrive at the age of twenty-one years; that the gross value of the life estate of the said Mary Ann Clark in the whole of the said premises was $6,601.44, and the costs of the proceedings amounted to about the sum of $50—after deducting which sum from the amount of the purchase money aforesaid, there would remain the sum of $2,028.38 due the said infants collectively, to be secured as aforesaid, or $1,014.19 each. He further reported that the above were the best terms upon which he could sell the said property, and in his opinion that the premises were an ample security for the payment of the balance of the purchase money.

The plaintiffs further alleged that on the 19th of November, 1851, this report and the agreement therein mentioned, were ratified and confirmed by the court; and it was further ordered, that the said special guardian should execute and acknowledge, and deliver to the said John Underwood, a good and sufficient conveyance of all the right, title, estate and interest of the said infants in and to the premises aforesaid, upon his compliance with the terms and conditions upon which the deed was to be delivered. And it was further ordered, that out of the purchase money paid by the said John Underwood upon the delivery of the deed, the special guardian should pay the sum of $6,601.44 to the said John Gardner, for the life estate of the said Mary Ann, and take his release and receipt in full dis-

charge thereof, and pay to the counsel of the petitioner the costs of the proceedings, to be taxed; and that the money which should be received from time to time for interest upon the bond and mortgage given by the purchaser, should be applied by such special guardian to the maintenance and education of the said infants. The plaintiffs further alleged that Montgomery, as such special guardian, did, on the 14th day of November, 1851, and before the said last mentioned order was filed or entered with the clerk, execute under his hand and seal, and deliver to the said John Underwood, a deed bearing date the said 14th day of November, 1851, purporting to grant and convey unto the said John Underwood, in consideration of $2,078.38, all the right, title and interest of the plaintiffs, in and to the premises mentioned and described in the said petition. And the plaintiffs further alleged that the said Montgomery, Gardner and Underwood had been informed and well knew that the said Mary Ann Clark was dangerously sick, and not expected to live, and that the life estate in the said premises, claimed by the said John Gardner would in all probability terminate by the death of the the said Mary Ann in a very few days, yet the said defendants fraudulently combining and confederating, &c., with the full knowledge of the dangerous illness of the said Mary Ann, caused and procured the said petition to be presented to the judge of Yates county court, as before mentioned, with an agreement and understanding that in case they the said defendants could procure an order for the sale of the said premises, Underwood should become the purchaser thereof, at the rate of about thirty dollars per acre for the whole, including the estate for the life of the said Mary Ann, and which said life estate should be estimated and valued according to the principle of life annuities, without any reference to the condition or circumstances of the said Mary Ann Clark, and which value of said life estate was to be deducted from the purchase money of the premises and paid over to Gardner, and in case of the death of the said Mary Ann, the said John Gardner was not to sustain any loss, but would thereby become fully possessed of more than two thirds the value of the premises, to the great injury of the plaintiffs. That the

Clark *v.* Underwood.

defendants failing in their contemplated proceedings before the judge of Yates county court as aforesaid, for the purpose and with a design of carrying into effect their aforesaid fraudulent agreement and design, withdrew the said petition and proceedings from before the judge of Yates county court, and instituted and completed the said proceedings hereinbefore mentioned in the supreme court. That the defendants well knew, at the time of presenting the petition to the supreme court, that Ezekiel Clark had been duly appointed and then was general guardian of Mary Alice Clark, the infant sister of the plaintiffs, and that he, the said Ezekiel Clark, as such guardian, was opposed to their proceedings or to a sale of the premises, yet they, the said defendants, well knowing that the said Ezekiel Clark was opposed to such proceedings being had or taken, and fearing that if said Clark should be informed of their said contemplated proceedings, he would appear and oppose the same, the defendants secretly and without the knowledge of the said Ezekiel Clark or of any other relation or friend of the plaintiffs, departed from the county of Yates and went to the county of Steuben and instituted the said proceedings. That the said Montgomery, Gardner and Underwood fraudulently concealed from the said supreme court and the said referee the facts in relation to the circumstances and condition of the said Mary Ann Clark, and the probability of the speedy termination of the estate for the life of the said Mary Ann in the said premises by her death. That the said Montgomery and the other defendants well knew, at the time the said Montgomery made and filed his said report of said sale, that the estate for the life of the said Mary Ann, in the premises, was not worth the sum of $6,601.44, as therein falsely and fraudulently represented. That the said Mary Ann Clark, the mother of the plaintiffs, died on the evening of the 15th day of November, 1851, and before the order confirming the said report of sale had been entered or filed. That Gardner never had the possession of the said premises under his pretended purchase of the life estate, they, the said George S. Clark and Mary Ann his wife, having refused to surrender up the possession thereof to him, the said John Gardner, on the

ground that the deed from the said Clark and wife had been fraudulently procured by the said John Gardner and Montgomery; all of which was well known to the defendants at the time of presenting the said petition to the supreme court. That Peleg Gardner and William S. Hudson had been informed, and knew before their examination as witnesses on the reference, before the said Ansel I. McCall, that the said Mary Ann Clark was dangerously sick, and was not expected to survive but a short time, yet the said Gardner and Hudson, by the direction and procurement of the defendants or some one of them, concealed the fact in relation to the true circumstances and condition of the said Mary Ann Clark in their testimony before the said referee. The plaintiffs further charged that before any of the proceedings hereinbefore mentioned were instituted, there was a secret agreement or understanding entered into, by and between the said John Gardner and John Underwood, that Gardner should sell and convey his interest in the said premises to Underwood for a much less sum or price than the sum of $6,601.44, the estimated value of the interest of the said Gardner in the same, and that the sum finally to be paid by Underwood to Gardner, if Underwood should succeed in obtaining a title under and by virtue of the said proceedings, was to be settled by and between them without any reference to the estimate as contained in the report of said sale made by the said special guardian as aforesaid. That the sum of $6,601.44 never had been in good faith actually paid by Underwood to the said special guardian, or to the said John Gardner; that Montgomery executed and delivered the deed hereinbefore mentioned, as special guardian, to Underwood, without having taken from Gardner a good and sufficient release in law of all the right, title and interest of the said Gardner in the premises. And that no release or other writing under seal was ever executed by Gardner to Montgomery, such special guardian, or to any other person, until after the execution and delivery of the deed by Montgomery to Underwood as aforesaid.

The plaintiffs further alledged that on the death of the said Mary Ann Clark, the said George S. Clark, then being in the

Clark *v.* Underwood.

possession of the premises, surrendered up the possession of such premises to the said Ezekiel Clark, the then general guardian of the said Mary Alice Clark, subject to the rights of a tenant under the said George S. Clark, and the said Mary Ann his wife; and that the said Ezekiel Clark entered into the possession of the said premises as such general guardian, and still held the possession for such person or persons as might be legally entitled to the same; that the said Mary Alice Clark died on the seventh day of December, 1851, leaving her surviving, George S. Clark, her father, and the plaintiffs, her next of kin and heirs at law. The plaintiffs charged that the said proceedings, and the deed as executed by Montgomery, as such special guardian, to said Underwood, were had and made in bad faith, and in fraud of the rights of the plaintiffs; wherefore the plaintiffs prayed that an order might be granted restraining the defendants, and especially Underwood, from intermeddling or interfering with the premises, and from taking or instituting any proceedings to recover possession of the same, and from doing or suffering any act to be done by which the said premises might be in any way or manner incumbered or affected; and that they might have judgment against the defendants, vacating and setting aside the report of the said Ansel J. McCall, and the order confirming the same, and the report of sale made by the said Archer C. Montgomery as such special guardian, as herein set forth, the order confirming the said report and directing the said conveyance, and the said deed of conveyance made by Montgomery, as special guardian to the said John Underwood, and all subsequent proceedings, and that Underwood be directed to release to the plaintiffs all the right, title and interest vested in him, Underwood, by virtue of the said deed; or for such other and further judgment, &c.

The defendant Underwood answered separately, denying most of the allegations in the complaint, and denying especially that the proceedings and the deed so executed by Montgomery as special guardian, to him, were had and made in bad faith, and in fraud and violation of the rights of the plaintiffs; but on the contrary, he asserted and charged that they were fair, honest,

*bona fide,* and in good faith. Montgomery and Gardner answered jointly and severally, also putting in issue the material allegations of the complaint relating to their actings and doings; denying that there was any secret agreement or understanding between Gardner and Underwood previous to the commencement of the proceedings for the sale of the real estate, that Gardner should sell and convey his interest therein to Underwood for a less sum than $6,601.44, the estimated value of Gardner's interest in the premises; denying that no part of the sum of $6,601.44 had been paid to Montgomery or Gardner, but alledging that a part of it had been paid to Gardner, and that the balance Underwood was liable and able to pay; and denying that the proceedings, and the deed so executed by Montgomery, the special guardian, for said premises to the said Underwood, or either of them, were had in bad faith, and in fraud and violation of the rights of the plaintiffs; and they, each of them, denied that they, or either of them, or the other defendants, to their knowledge, information or belief, had made any fraudulent representations, or been guilty of any fraudulent acts, or concealment, in procuring the sale of said estate. On the contrary, they charged and insisted that the whole transaction was fair, honest, and *bona fide,* and in good faith.

The plaintiffs, by their reply, put in issue the allegations of the answers. The action was tried before his honor, Thomas A. Johnson, one of the justices of this court, at a special term, held in the county of Yates, in November, 1852. The plaintiffs' counsel made a statement of the facts of the case to the court. The defendants' counsel then moved the court for a dismissal of the complaint, on the ground that it did not state facts sufficient to constitute a cause of action. That admitting the facts therein stated to be true, the plaintiffs were not entitled to the relief therein demanded. That the sale and conveyance of the premises having been made pursuant to the statute, the same could not be avoided or amended by reason of any fraud alleged in said complaint. The court denied the motion, and decided to go into the proof, to which the defendants excepted. The plaintiffs, to prove their case, offered and gave in evidence an exem-

Clark v. Underwood.

plified copy of the several instruments and papers mentioned and set forth in the complaint. They then called as a witness, Andrew F. Oliver, who testified that he was a practicing physician and knew the plaintiffs; that he knew their mother in her life time. She died on the 14th or 15th of November, 1851; the witness was her attending physician; that he understood she had been sick since July, 1851; that he was called in, the fore part of September, and found her laboring under severe fever, arising from her confinement in July prior. This fever continued more or less up to her death, sometimes better and sometimes worse. She continued this way up to two or three weeks before her death, and then the witness thought she would recover, but for the last two or three weeks before her death he gave up all hopes of her recovery, and so expressed himself; that he came home one evening from G. S. Clark's about a week before her death; that he started to go to Judge Oliver's office; as he passed through the gate he passed Underwood, and as he went on the stoop he met Montgomery and Gardner. Gardner asked him how Mrs. Clark was. The witness told him she was very sick, and would not probably live but a few days. Montgomery said, " she is very sick then ?" The witness replied, " yes, she would not probably live till morning." The witness stepped into the office, where he saw Montgomery. He understood Montgomery was making application for the sale of the premises. Lewis and he were in one office and Judge Oliver in the other. Ezekiel Clark and James Brown came in while the witness was in the front office. Clark and Judge Oliver and Montgomery were in the back office; while there Clark and Montgomery talked about the sale of these premises. They talked pretty loud. Clark objected to the sale, and said it was not necessary, as there were no debts, and that Mary Ann Clark was sick and would die. The witness was asked by Judge Oliver as to the sickness of Mary Ann, and he told him she would not live a week. But he was not sure Montgomery was then present. The witness was sent for while in the office, to see Mary Ann. He went, and found her in spasms and insensible; under strong stimulants, occasionally she would rouse up. This was the lat-

ter part of the week. She was about as she had been a week before. Witness saw Gardner next morning, who asked him how she was; witness told him she was alive, but very low indeed. Gardner wanted witness to take hold and help him procure this sale, saying, " you can influence the young judge." The witness met Underwood some ten or twelve days before this ; as witness came out Underwood followed him and talked about election, and said, we are going to, or that Gardner was going to, make application for the sale of this property ; that there was an election coming off, John L. Lewis was a candidate for judge, and he might give him a boost. Witness told him Mary Ann Clark was very sick, and probably would not live but a short time. She continued failing from the 7th or 8th until she died. He wanted the witness to see the young judge, and said they were going to give the job to Lewis, who was the witness's son-in-law.

Andrew Oliver, a witness on the part of the plaintiffs, testified that he was judge of Yates county in Nov. 1851 ; that a petition was presented to him for the sale of the premises in question, on the 7th of that month, in the evening ; Montgomery was present. It was stated then that Mary Ann Clark was very low, and was not expected to live but a little while ; Dr. Oliver, James Brown and E. Clark told the witness of her sickness ; Montgomery was in the room, if the witness remembered right ; they were passing in and out of the two rooms ; that he did not grant any order on that petition ; that he told Lewis, and he thought he told Montgomery, that he refused on the ground that it was not necessary, and because Mary Ann was sick ; Dr. Oliver told the witness that Mary Ann was sick ; that the next morning, as the witness was going down street, he met Underwood, who asked him if he had made up his mind to grant the order ; witness told him he had not. He wished the witness to consider it, and make the order and let the referee report upon the facts. The witness told him there was no use of haste, as a few days might make it entirely unnecessary ; that he did not wish to act hastily in the matter, as it was of great importance.

Clark *v.* Underwood.

Ezekiel Clark testified that he was present at the time spoken of by Doctor Oliver, at Judge Oliver's office; that he was appointed general guardian of Mary Alice Clark, that evening; that after his appointment, he had a conversation with Montgomery, and asked him how he proposed to sell the premises. He said he proposed to sell them to John Underwood at $30 per acre, and was going to reckon the value of the life interest of Mary Ann by the Northampton tables. The witness objected to that. She was too young a woman; it would figure out such a price; that she was very sick and her life interest was not worth any thing, as she would not live but a few days; the witness then insisted on his waiting a few days, until they could see how it terminated. He insisted that it was necessary to sell the premises to support the children, and the witness insisted that it was not; that there was abundance of means without selling that; that it was their only home, and it would not do to sell it. That Montgomery knew the witness had been appointed general guardian. He was present when it was done. The next morning after, he wished to see the witness, and talk with him about these matters. That the witness came down the next morning, and saw Montgomery, and told him he would not consent to have the premises sold at $30 per acre, as he would give $40. Witness asked how it was he wanted to sell to a particular man at a particular price. Why not put it up in market, and not sell it according to the Northampton tables? Witness told him the life estate was not worth any thing, as she would not live but a day or two. Witness told him Dr. Oliver had been up there, and that she was past knowing any thing. The witness forbade him interfering with the interest of Mary Alice, and insisted on his waiting to see how the mother got along; he insisted, that if it must be sold, he should sell it to the highest bidder; that when they parted, Montgomery remarked, that he would go home and give it up. The witness then told him it was not necessary to sell the land, as he would agree to take the children and keep them and the farm, and when they became twenty-one, he would give them up their farm with a revenue; that he had no notice of the proceedings at Bath,

Steuben county; that the land was worth $50 per acre at the time of the sale.

James Brown testified that his wife was the half-sister of the plaintiffs; these infants and Mary Ann resided on the premises in question in November, 1851; witness saw her almost every day; she was taken down and lay in that state a long time; she always said she was no better; said she would not get well; from the time spoken of at Judge Oliver's office, she continued to fail all the time; she died the 15th November, 1851; witness had no notice of the proceedings at Bath; Mary Ann left three children; Mary Alice has since died; witness's farm adjoined theirs.

The order confirming the report of the special guardian, and directing him to execute a deed to Underwood, in pursuance of the agreement, bore date Nov. 14, 1851, the day before Mrs. Clark died. It did not appear when it was actually entered. The above is the most material part of the plaintiffs' testimony. After the plaintiffs had closed their proof, the defendants' counsel moved for a nonsuit, on the grounds taken by him in the opening of the cause, and also upon the ground that the evidence elicited did not show such a state of facts, or such a fraud, as would warrant the court in annulling or setting aside the deed from Montgomery to Underwood; which motion was denied by the court, and the defendants excepted. The defendants also moved for the discharge of Montgomery, which was denied by the court, and the defendants excepted.

Peter Cameron being sworn as a witness on the part of the defendants, the defendants offered to prove by him the following conversation between Montgomery and John Gardner: That a few days after Montgomery had presented the petition to Judge Oliver for the sale of the premises in question, Gardner came into his office, and he asked him if he had heard from Mrs. Clark; he said he had not; he asked him if he had withdrawn that petition; he said he had not. Montgomery then said to him, "Did I not tell you to withdraw that petition unless you learned that Mrs. Clark was better by this morning?" "You did." "Then I want you to go right off and withdraw that petition." Gardner

Clark *v.* Underwood.

said he would, and started off to do so. The next morning he returned, and when he came into Montgomery's office, Montgomery asked him if he had withdrawn the petition; he said he had, and that he wanted Montgomery to go to Penn Yan, and go on with the business before Judge Oliver; that Montgomery told him he would not, unless Mrs. Clark got better. Gardner said Dr. Oliver told him that day that she was much better. Montgomery then said he could not go to Penn Yan that week, as he had business at Bath; that if he did any more about it that week, he would have to do it at Bath, as he was going there the next day on business, and would be there during the week; that if Gardner was a mind to go out with him, he would state all the facts of the case to S. H. Reed, a counsellor of this court, and if he thought there was no impropriety in making the application under the circumstances, he would do so, as there was a circuit court then in session at Bath; provided Gardner would get the witnesses to come to Bath. This offer was objected to by the plaintiffs, and the objection sustained by the court, and the evidence excluded, and the defendants excepted. The defendants also offered to prove by this witness that on Tuesday, the 11th day of November, 1851, Gardner told Montgomery that Dr. Oliver told him Mrs. Clark was better, and that he thought she would get well; which offer was objected to by the plaintiffs, and the objection sustained by the court, and the evidence excluded. The defendants excepted.

Andrew F. Oliver, recalled by the plaintiffs, further testified that he remembered hearing them discuss the sickness of Mary Ann, he thought, some little time prior to the proceedings before Judge Oliver; that he told Gardner she seemed to revive up a little under strong stimulants; but he did not recollect of telling him that she would get well. That there was a little time, just previous to the proceedings before Judge Oliver, that she seemed to revive a little ; that he thought this must have been the time Gardner inquired of him; that for the last ten days before her death, he had no hopes of her recovery.

The evidence being closed, the following opinion was delivered.

by the judge before whom the cause was tried; and an order was entered in conformity with its provisions :

"JOHNSON, J.   A careful and attentive consideration of all the evidence in this case, has led my mind irresistibly to the painful but undoubting conviction that at the time of making the application to the court for the sale of the real estate of the plaintiffs, and which resulted in the order of sale, the defendants all well knew the critical, and, indeed, utterly hopeless condition of the mother of the plaintiffs, of whose life estate the defendant Gardner was then seised; that this important fact, upon which the whole real intrinsic value of such life estate depended, was carefully suppressed, and designedly concealed from the knowledge of the court, by concert and arrangement, with a view and for the express purpose of obtaining an order to sell, and thus enable the defendant Gardner, from the avails of the sale, upon the basis of the Northampton tables, to appropriate the lion's share, for an interest which was not worth, in fact, as the result proved, or in prospect, in all human probability, at the time, a single hour's purchase.   The knowledge is brought home to each defendant directly, by the evidence.   The concert and combination are shown by the joint and separate acts of the parties, and the various appliances brought to bear, from the time the scheme was first broached, to its final consummation.   The design is clearly inferable from the complete adaptation and fitness of the means employed to the end attained.   The law presumes that parties design to bring about the end they attain, when the means used are directly calculated to produce such result.   The motive of the defendant Gardner can be seen, clearly enough.   The case was pressing, and admitted of no delay.   So critical was his tenure, that the delay of a single day, or hour might make a difference to him of just $6,601.44, the amount he received, for an estate which actually terminated within a few hours after the sale was completed.   The defendant Underwood is the brother-in-law of Gardner, and may be supposed to have sympathized with him, and thus been induced to lend aid and assistance which he would not have done in the case of a mere

Clark *v.* Underwood.

stranger or neighbor. But the motives which actuated the defendant Montgomery, the guardian of the infant children of a dying mother, and an intemperate and utterly incapable father, are not so readily discovered. He was called upon by every consideration of moral, parental and official duty and obligation, to guard, protect, and secure the interests of his wards. Instead of this, he was the most active, determined, persevering agent, in bringing about a state of things which was sure, under the forms of law, to transfer, without consideration or benefit to them, a large share of their legitimate heritage, to a stranger. The pretence that he believed the mother of his wards to be convalescent, at the time of making the application, is too transparent to gain credence. He knew that her health had been for some time declining, and had been assured by her physician, only a short time previous, that her recovery was hopeless, and that she could not, at best, live beyond a very few days. He could easily have ascertained the truth; and the importance of the truth of the case to the pecuniary interest of those under his charge, called upon him not to act without knowing what her actual condition was. Such credulity in a case like that, is incredible upon any supposition short of utter imbecility or aberration of mind. No sane person, who was *compos mentis*, would voluntarily consent to part with the interest he was so eager to secure to Gardner, in his own case, upon the faith of vague rumors. Indeed, it is but too obvious that he was not at all in the interest of his wards, but, deserting his sacred trust, was giving to Gardner the aid and protection he owed to them. Such conduct can scarcely be characterized as it deserves, consistently with the decorum of judicial review. It is insisted by the defendants' counsel, that the court having the power to order the sale, even if it had known of the situation of Mrs. Clark, it cannot be known or alleged that the sale would not have been ordered had her situation been fully disclosed, and therefore, no fraud or claim for redress, can be predicated upon the supposition of such a fact. Courts may, and often do, err in judgment; but it must be assumed that they will always exercise their discretionary powers to promote the ends of substantial justice, and

never to favor manifest injustice and cupidity. Suppose the facts had been disclosed by the petition, and in the evidence before the referee, where Montgomery himself was a witness, that Mrs. Clark was in the last extremity of sickness; that her recovery had been declared impossible by her attending physician; and that she was at that moment in a state of insensibility; could such a sale and distribution of the proceeds have been ordered or sanctioned? The assumption that it could, would be in the last degree derogatory not only to the capacity and character of the judge, but to the administration of justice. It is clear enough, that no judge, having the least regard for himself, or for the rights of others, would have ordered a sale, under such circumstances. It was, unquestionably, the suppression of this important fact alone, which enabled the defendants, under the sanction of judicial forms, to perpetrate this flagrant wrong against the plaintiffs. It was a fact in the case, known to the defendant and unknown to the court, but the knowlege of which by the court, was indispensable to a discreet and proper exercise of its powers in the premises. The court had no means of knowing or ascertaining the fact, and the defendants well knew that their whole scheme would be defeated by its disclosure. Under such circumstances, the suppression of the truth is equivalent to the direct assertion of falsehood.

It is urged that the defendants were under no obligation to disclose, and therefore are not amenable. Whatever may be said in this respect as to the other defendants, it certainly cannot be affirmed of the defendant Montgomery. He was bound by every consideration of duty and fidelity to his trust, to disclose every fact in the case which might seriously affect the interest of his wards. It is not the case of two contracting parties with the source of knowledge equally open to both, where the purchaser has acquired some knowledge affecting the quality or condition of the subject of the purchase of which the seller is ignorant. In such case it has been held that if the purchaser do nothing whatever to mislead, he is under no obligation to disclose. But this is in no respect analogous to such a case, in principle. The court was no party. It was charged with no

Clark *v.* Underwood.

duty, other than that of exercising a sound and reasonable discretion upon the case presented. It could not but presume that the qualified representative and guardian of the infants, was acting in good faith. But it is urged that the court having passed upon the case presented, and there being no error in the exercise of its discretion, and the order or judgment entered upon the case so presented, it has now no power to undo what it has ordered to be done, even if the case presented did not contain all the material facts. If it be true that courts cannot undo the wrong they have unwittingly done, through misrepresentation or fraudulent suppression of material facts, and place parties in *statu quo*, the power with which they are clothed is certainly most lamentably defective. But there is no lack of power in such a case when fraud is alleged and clearly established, as it is here. There is no need of invoking precedents, or authority, to sustain so plain and reasonable a proposition. Fraud not only vitiates all sales and conveyances into which it enters, but the power and authority to sell and convey also, from whatever source derived. An order giving a party authority to sell and convey, fraudulently obtained from a court, is no better than a power fraudulently derived from the party whose rights are injuriously affected by it. It may always be annulled at his instance, upon establishing the fraud, at least as to all persons who were parties or privies to such fraud. *No rights acquired in good faith*, intervene here, and there is no obstacle to placing the parties again in *statu quo*. All the orders, therefore, entered in the special proceedings, including the order of sale and the order confirming such sale, must be vacated and annulled the defendant Underwood be ordered and decreed to reconvey the premises conveyed to him by the defendant Montgomery, and Montgomery be directed to cancel and to surrender the bonds, and satisfy of record the mortgages, taken by him for the plaintiffs upon such sale ; the defendants to pay plaintiffs' costs of suit."

Upon appeal to the general term the decision of the justice at special term was unanimously *affirmed* upon the merits, and the principles asserted in the opinion adopted. Although Justice Strong was of opinion, as will be seen, that a new trial should be granted, on the ground that the justice at special term erred in rejecting evidence offered by the defendant on the trial. The cause was argued, upon the appeal, by

*D. B. Prosser*, for the plaintiffs.

*W. Barnes*, for the defendants.

T. R. STRONG, J.   The proof which the defendants offered to make by the witness Cameron, and which was rejected, should, I am satisfied, have been received.   The conversations between Montgomery and Gardner, two of the defendants, proposed to be proved, were intermediate the presentation of the petition to the county judge, and the application to this court at special term for a sale, and but a brief period before the order for a sale was obtained ; they related to the past as well as to future proceedings to effect a sale, all of which are charged to have been fraudulent ; and were so connected with those proceedings as to form a part of them ; and they were of such a nature as to be entitled to some consideration, upon the question as to the motive with which those proceedings were conducted.   They were part of the *res gestæ*, calculated to afford some light on the subject under investigation, and, as such, proof of them was admissible.   Whenever the intention with which an act is done becomes a subject of inquiry, the conversations and declarations accompanying it, of the persons by whom it was performed, may be proved in their favor, as part of the *res gestæ*. (1 *Phil. Ev.* 231.   1 *Greenleaf's Ev.* §§ 108, 109, 110.) Several illustrations are given and authorities referred to by those authors, and numerous others will be found in *Cowen & Hill's Notes*, 585 to 606. (*See also* 3 *Greenleaf's Ev.* § 99.   *Rex* v. *Whitehead*, 1 *Car. & Payne*, 67.)   It would often lead to error, and be highly unjust, to refuse such evidence in explanation of the

Clark *v.* Underwood.

conduct of men. In regard to the communication of Gardner to Montgomery, on the 11th of November, the day before the order for a sale was made, of what the attending physician of Mrs. Clark had told him in reference to her health, proof of it was clearly admissible, as showing, in part, the information upon which Montgomery acted. Greenleaf says, (*Vol.* 1, § 101,) "Where the question is whether the party acted prudently, wisely, or in good faith, the information on which he acted, whether true or false, is original and material evidence. This is often illustrated in actions for malicious prosecutions, and also in cases of agency, and of trusts." Evidence of similar communications to Montgomery by other persons was received without objection, and a distinction appears to have been taken, between information given by Gardner and that received from others, but I am not aware of any good ground for such a distinction.

This proof might not have affected the result, but it is sufficient to call for the granting of a new trial, that the defendants were entitled to make it, and may have been prejudiced by its exclusion. It would have tended to show that Montgomery was not guilty of the fraud charged, and proof of that fact would have essentially aided each of the other defendants in his defense.

Aside from the offers and rejection of evidence which have been considered, I should have no difficulty in sustaining the judgment.

I am therefore of opinion that the judgment should be reversed, and a new trial granted as to the appellant; but my brethren have arrived at the conclusion that the evidence rejected, if it was admissible, and had been received, could not have affected the result, and that the judgment should be affirmed.

Judgment affirmed, with costs.

[MONROE GENERAL TERM, September 5, 1853. *Welles, Selden* and *T. R. Strong,* Justices.]